| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------X<br>BRUCE SILVERSTEIN and BRUCE<br>SILVERSTEIN GALLERY, LLC,<br><br>                             Petitioners,<br><br>                -against-<br><br>XL SPECIALTY INSURANCE COMPANY,<br><br>                             Respondent.<br>------------------------------------------------------------X | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: 7/26/16<br><br><br>15-CV-6818 (VEC)<br><br>AMENDED<br>MEMORANDUM<br>OPINION & ORDER |

VALERIE CAPRONI, United States District Judge:

Bruce Silverstein Gallery, LLC ("the Gallery") and Bruce Silverstein ("Silverstein"), the Gallery's owner (collectively, "Petitioners"), bring this action against XL Specialty Insurance Company ("XL") to vacate an appraisal award for photographs destroyed or damaged during Hurricane Sandy.[1] Petitioners contend that the appraiser acted outside the scope of his authority. For the following reasons, Petitioners' petition and motion to vacate the appraisal award are DENIED, and the case is DISMISSED.

## BACKGROUND

Silverstein is the sole member of the Bruce Silverstein Gallery, LLC, which owns an art gallery on West 24th Street in New York City. Affirmation in Opposition to Bruce Silverstein and Bruce Silverstein Gallery LLC's Petition to Vacate Appraisal Award ("Wade Aff.") Ex. B-7 (Dkt. 16); Petition to Vacate Appraisal Award ("Pet.") ¶ 13 (Dkt. 1). In October 2003,

---

[1] The parties call Sandy a hurricane. According to the National Hurricane Center, by the time Sandy hit the New York City area it was no longer a hurricane (hence the frequent reference to it as a "superstorm"). *See* Al Conklin, *What's in a name? Sandy: Hurricane or Superstorm*, 12 WSFA, http://www.wsfa.com/story/21807734/whats-in-a-name-sandy-hurricane-or-superstorm (last visited July 19, 2016). While that distinction may be of great fascination to storm watchers, it is of no moment to this insurance dispute.

Silverstein purchased 6,000 Frank Paulin ("Paulin") photographs for $201,000 ($33.50 per photo). *See* Wade Aff. Ex. B-19; Memorandum of Law in Opposition to Bruce Silverstein and Bruce Silverstein Gallery, LLC's Petition to Vacate Appraisal Award ("Resp't's Opp'n") 1 (Dkt. 17); Petitioners' Memorandum of Law in Support of Their Petition to Vacate the Appraisal Award Dated August 10, 2015 ("Pet'rs' Mem. Law") n.2 (Dkt. 11).[2] In March 2007, Silverstein executed an agreement ("Consignment Agreement") consigning 5,000 of the Paulin photographs to the Gallery for $1,000,000 in retail value ($200 per photo). Declaration of Joshua L. Mallin in Support of Petitioners' Petition to Vacate the Appraisal Award Dated August 10, 2015 ("Mallin Decl.") Ex. AA (Dkt. 12). The Consignment Agreement is the only documentary evidence that has been presented demonstrating that Silverstein consigned the Paulin photos to the Gallery or the price at which they were consigned. Works consigned to the Gallery by other artists were identified in the Gallery's electronic inventory system as being on consignment, but there was no such indication relative to the Paulin photos. Mallin Decl. Ex. J, at 163-168; Wade Aff. Ex. B, at 196-197.[3] The Consignment Agreement allowed Silverstein to change the prices at which the Paulin photos would be sold. Mallin Decl. Ex. AA. Silverstein set the prices for all photos sold at his Gallery. Mallin Decl. Ex. J, at 40:8-13.

Silverstein and the Gallery had separate "All Risks Fine Art Dealers Floater" insurance policies. Pet. ¶ 2; Mallin Decl. Exs. A, B. The "Basis of Valuation" provision in the Gallery policy provides that "[c]onsigned property shall be valued at the Agreed Net Consigned Value

---

[2] Although the parties agree that Paulin sold or consigned his photographs to Silverstein individually, the October 2003 sale contract states that the Gallery purchased the photos from Paulin. Wade Aff. Ex. B-19. A 2008 amended agreement between Paulin and Silverstein also states that the Gallery owns the photos. Mallin Decl. Ex. I.

[3] Silverstein could not point to anything in the Gallery's internal inventory system that indicated the Paulin photographs were on consignment. Mallin Decl. Ex. J, at 163-168; Wade Aff. Ex. B, at 196-197.

Plus 10%." Mallin Decl. Ex. A ¶ 7(B).[4] The "Valuation" provision in Silverstein's individual policy states:

> Property insured hereunder shall be valued at the amount indicated on the schedule attached to this policy and/or the schedule on file with the Company and/or Hub International Northeast Limited &/or Fair Market Value at time of loss, whichever is greater, not to exceed 150% of the scheduled value on any one item or the limit of liability of this policy in total.

Mallin Decl. Ex. B ¶ 6. No schedule was attached to the individual policy. *See id.* The Gallery tracked its artwork in an inventory database but did not maintain updated prices in that database for much of its artwork, including the Paulin photos; for most works, Gallery employees had to ask Silverstein himself before a price could be quoted to a customer. *See* Mallin Decl. Ex. J, at 34:19-37:4, 90:13-15, 93:7-17, 94:15-95:4, 112:12-20, 115:16-17.[5]

On October 29, 2012, Sandy struck the New York area, flooded the Gallery, and destroyed or damaged approximately 1,300 photographs. Pet. ¶ 19; Wade Aff. ¶ 3. All except twenty-seven of the destroyed or damaged photos were Paulin photos. Wade Aff. ¶ 4. On November 27, 2012, Silverstein submitted a claim to XL under his personal insurance policy,

---

[4] "Endorsement # 1" in the Gallery policy, which sets forth a "Valuation Clarification Clause," states:

> This policy covers property of others for which the insured is responsible for the net consigned value agreed upon between the insured and the consignor &/or for the insured's legal liability for such property as well as the interest of the insured in such property as expressed by % (percentage) in excess of the Agreed Net Consigned Value.

Mallin Decl. Ex. A, at 1.

[5] For artwork by contemporary artists, the Gallery had prices listed in separate binders, and Gallery employees were free to quote prices for those works. Mallin Decl. Ex. J, at 38:9-17. Silverstein testified that "contemporary" applied to "living artists that are producing works today", *id.* at 39:6-7, and testified that Paulin "takes pictures still," *id.* at 40:7. Silverstein and the Gallery, however, did not seem to treat the Paulin photos as contemporary as there was no price list for the Paulin photos—let alone any up-to-date written price. *See id.* at 90:13-15, 93:7-17, 94:15-95:4, 112:12-20, 115:16-17. Nevertheless, it was Silverstein who priced all photos sold by the Gallery, regardless of whether those prices were listed in binders, appeared in the database, or were simply quoted to a customer on the spot. *See id.* at 40:8-13.

3

which had a limit of $2,501,500. Wade Aff. ¶ 5. In that claim, Silverstein stated that 785 Paulin photographs had a value of $4,526,500. Wade Aff. ¶ 5. Silverstein arrived at that amount by extrapolation, relying on a 2009 appraisal of Paulin photos. Mallin Decl. Ex. J, at 99:17-100:17, 104-05. That appraisal had been prepared to assist Silverstein in claiming a personal tax deduction for photographs that he donated to charity. *Id.* at 84-87. Drawing on that 2009 appraisal, after Sandy, Silverstein went into the Gallery's database and retroactively assigned values to the Paulin photos—in part he provided values where there previously were none and in part he overwrote existing values. *Id.* at 118-119, 122-133.

On January 18, 2013, Silverstein submitted a claim under the Gallery policy, which had a limit of $17,500,00. Wade Aff. ¶ 7. In that claim, Silverstein asserted that he had consigned the Paulin photos to the Gallery and that under the Gallery policy, the Gallery was entitled to collect the net consignment value plus 10%, totaling $4,526,500 for the Paulin photos. *Id.*

On March 29, 2013, the parties entered into a partial settlement for the maximum value of the personal policy, and they agreed the payment was unallocated between the personal and Gallery policies. Mallin Decl. Ex. Z; Wade Aff. ¶ 6. Because XL determined that Silverstein had been fully compensated for his loss, it refused to pay the Gallery under its policy for any loss to the Paulin photos. Wade Aff. ¶ 9.

On September 30, 2014, Silverstein filed a Petition for a Special Proceeding in New York Supreme Court to compel appraisal under the policies and to appoint an umpire. Wade Aff. Ex. C. The parties submitted four names to the New York Supreme Court. Wade Aff. Ex. E. The New York Supreme Court judge selected Judge Beeler to serve as umpire and explicitly ordered that Judge Beeler had authority under both insurance policies. Wade Aff. Ex F.[6] Both

---

[6] Specifically, the order provided that Judge Beeler was appointed umpire "with the powers and directions set forth in XL Specialty Insurance Company All Risks Fine Art Dealers Floater Policy Number

sides submitted appraisal reports, rebuttal reports, and testimony before Judge Beeler.  Pet. ¶¶ 5, 32-33, 35; Wade Aff. ¶¶ 14-22.

XL's appraiser, Victor Weiner, valued the damaged and destroyed photographs based on their fair market value (i.e., the price at which the property would change hands between a willing buyer and seller) as of the date of loss, October 29, 2012.  Wade Aff. Ex. G, at 6, 12.  Weiner applied a market comparison approach to determine fair market value, meaning Weiner compared the photos at issue to other similar photos that had been sold or offered for sale at public auction or by private galleries, including the Gallery.  *Id.* at 13-14, 26-41.  In addition, Weiner took into account the original purchase price of the 6,000 Paulin photos and the Gallery's efforts to market Frank Paulin's work.  *Id.* at 16, 17, 26.  Weiner also applied a blockage discount to the Paulin photos because under the Uniform Standards of Professional Appraisal Practice ("USPAP") Standard 6, "when a whole universe or 'mass' of property is required to be valued as of a specific effective date, the appraiser is required to take into consideration that the value of the whole may be different than the sum of the individual parts."  *Id.* at 41-42.  Weiner employed an economist, Jannette Barth, Ph.D., to prepare a separate report to determine the blockage discount.  *Id.* at 42; Mallin Decl. Ex. R.  Barth determined the block discount by calculating the discounted present value of the future income stream for the number of years it would have taken to sell the volume of Paulin photos at issue.  Mallin Decl. Ex. R., at 2.  Weiner concluded that the entire collection of the 6,000 Paulin photos was worth between $2.7 and $2.9

---

UM00021932SP12A, paragraph 26 and XL Specialty Insurance Company All Risks Fine Art Dealers Policy Number UM00021931SP12A paragraph 29 . . . ."  Wade Aff. Ex. F.  Silverstein's individual policy was numbered UM00021932SP12A, while the Gallery's policy was numbered UM00021931SP12A.  Mallin Decl. Exs. A, B.

million and that the destroyed and damaged Paulins, after applying the 80% blockage discount, were worth between $585,723 and $590,716. Wade Aff. Ex. G., at 44-45.[7]

Petitioners' appraiser, Edward Yee of Penelope Dixon & Associates, also valued the damaged and destroyed photographs based on fair market value and also adopted a comparative market approach. Wade Aff. Ex. H, January 27, 2015 Letter from Edward Yee to Bruce Silverstein. In 2009, Silverstein had personally hired Penelope Dixon & Associates to appraise Paulin photos that he intended to donate to charity. Mallin Decl. Ex. J, at 87; Mallin Decl. Ex. Y. In contrast to Weiner, Yee did not apply a blockage discount, relied less heavily on auction data, and did not account for the purchase price of the 6,000 Paulin photos. *See* Wade Aff. Ex. H, January 27, 2015 Letter from Edward Yee to Bruce Silverstein; Wade Aff. Ex. L, at 3-6, 9-10. Yee valued the destroyed and damaged Paulin photos at approximately $4.3 million. Wade Aff. Ex. H, at 1. Thus, Yee arrived at approximately the same value for the Paulin photos as Silverstein had claimed based on his post-loss extrapolations of value based on the 2009 donation appraisal.

On August 10, 2015, Judge Beeler issued an award in favor of XL. Pet. ¶¶ 6, 36; Mallin Decl. Ex. X. Judge Beeler determined that he was not bound by the net agreed upon consignment value specified in the Gallery policy because: (1) Silverstein owns 100% of the Gallery and therefore there was no arm's length consignment; (2) Silverstein admitted to retroactively assigning values to many of the photos after they had been destroyed or damaged; (3) when retroactively assigning value to the photographs, Silverstein had extrapolated from the 2009 appraisal prepared for the purpose of him claiming a charitable tax deduction, a very

---

[7] The valuation has a range because there is a dispute over the number of Paulin photos sent for restoration; the Gallery claims 497 photos were sent for restoration, while the restorer claims 393 photos were sent for restoration. Wade Aff. Ex. G., at 45

different purpose than the purpose of the current appraisal; and (4) the 2007 Consignment Agreement valued the Paulin photos at $200 per photo, considerably less than what Petitioners were claiming under the Gallery policy.  Mallin Decl. Ex. X, at 2-3.  Judge Beeler determined that XL's appraiser's valuation more accurately reflected the value of the loss as of October 29, 2012.  *Id.* at 5.  In adopting XL's appraiser's valuation, Judge Beeler specifically noted the variety of factors the appraiser took into account.  *Id.*  He also adopted the blockage discount, stating that doing so was in accordance with USPAP Standard 6 and was logical given the large number of items damaged and destroyed at one time.  *Id.*  Thus, according to Judge Beeler's appraisal award, because Silverstein had been fully compensated for his loss, no additional funds were due from XL.

On August 27, 2015, Petitioners initiated this action to vacate Judge Beeler's appraisal award arguing that Judge Beeler exceeded the scope of his authority by applying valuation methodologies foreign to the Gallery and individual policies.  Pet. ¶¶ 42-51.  Taking into account the earlier settlement, Petitioners claim that approximately $3,725,001 remains in dispute, covering destroyed Paulin photographs and storage and salvage expenses for damaged photographs.  *Id.* ¶ 24; Pet'rs' Mem. Law 7, n.12.

## DISCUSSION[8]

"'New York courts have long recognized the role of appraisals in resolving disputes between an insurer and insured where the disagreement is [only] over the value or the amount of the loss.'"  *Amerex Grp., Inc. v. Lexington Ins. Co.*, No. 07 CIV. 3259 (HB), 2010 WL 3790637, at *2 (S.D.N.Y. Sept. 28, 2010) (alteration in *Amerex*) (quoting *Indian Chef, Inc. v. Fire and*

---

[8]    Subject-matter jurisdiction over this dispute exists pursuant to 28 U.S.C. § 1332.  There appears to be no disagreement that New York law governs the dispute.

7

*Cas. Ins., Co. of Conn.*, No. 02 CIV. 3401 (DLC), 2003 WL 329054, at *2 (S.D.N.Y. Feb.13, 2003)), *aff'd*, 678 F.3d 193 (2d Cir. 2012). The sole purpose of an appraisal is to determine the value of the loss. *Indian Chef, Inc.*, 2003 WL 329054, at *3 (citing *Penn Cent. Corp. v. Consol. Rail Corp.*, 56 N.Y.2d 120, 130 (1982)). An appraiser does not have the authority to determine the scope of insurance coverage, which is purely a legal issue; the appraiser is limited to factual disputes over the loss amount. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citing *Indian Chef, Inc.*, 2003 WL 329054, at *3; *Zar Realty Mgmt. Corp. v. Allianz Ins. Co.*, No. 02 Civ. 6741 (HB), 2003 WL 1744288, at *4 (S.D.N.Y. Mar. 31, 2003)).

The New York Court of Appeals has interpreted C.P.L.R. § 7601 to empower a court to hold a special proceeding to confirm an appraiser's award. *Penn Cent. Corp.*, 56 N.Y.2d at 130.[9] Petitioners move to vacate the appraisal award based on Article 75 of the C.P.L.R., specifically § 7511, which governs vacating or modifying an arbitration award. N.Y. C.P.L.R. § 7511 (McKinney 2016). Although there is no comparable statute for vacating or modifying an appraisal award, appraisal awards receive deferential judicial review that is similar—but not identical—to the standard of judicial review for arbitrations awards. *See Clark v. Kraftco Corp.*, 323 F. Supp. 358, 360 (S.D.N.Y. 1971) ("[R]eview of appraisals is governed by different and broader standards [than review of arbitration awards]." (citing *Cohen v. Atlas Assurance Co.*,

---

[9]   Section 7601 states, in part:

>   A special proceeding may be commenced to specifically enforce an agreement that a question of valuation, appraisal or other issue or controversy be determined by a person named or to be selected. The court may enforce such an agreement as if it were an arbitration agreement, in which case the proceeding shall be conducted as if brought under article seventy-five of this chapter. Where there is a defense which would require dismissal of an action for breach of the agreement, the proceeding shall be dismissed. . . .

N.Y. C.P.L.R. § 7601 (McKinney 2016).

8

148 N.Y.S. 563 (App. Div. 1914))). Nevertheless, "a dissatisfied party who participated in the selection of an independent appraiser has no greater right to challenge the appraiser's valuations than he would have to attack an award rendered by an arbitrator." *Penn Cent. Corp.*, 56 N.Y.2d at 130 (citations omitted); *see also Questrom v. Federated Dep't Stores, Inc.*, 41 F. Supp. 2d 294, 302 (S.D.N.Y. 1999) ("[J]udicial review of [an appraiser's] determination is limited."), *aff'd*, 2 F. App'x 81 (2d Cir. 2001).

An appraisal award should be upheld unless there is clear and convincing evidence that the appraiser rendered the award in bad faith without sufficient thoroughness or based on bias or fraud. *See Forbes v. Cendant Corp.*, 205 F.3d 1322 (2d Cir. 2000) (summary order); *Clark*, 323 F. Supp. at 360 (citing *Cohen*, 148 N.Y.S. at 566); *Liberty Fabrics, Inc. v. Corp. Props. Assocs. 5*, 636 N.Y.S.2d 781, 781 (App. Div. 1996) (citation omitted); *Olympia & York 2 Broadway Co. v. Produce Exch. Realty Tr.*, 462 N.Y.S.2d 456, 458 (App. Div. 1983); *see also* David D. Siegel, New York Practice § 608 (5th ed. 2016) ("[M]ere error of law or fact is not a ground for rejecting the appraisal."). Courts have also explicitly applied C.P.L.R. § 7511 in reviewing appraisals on a motion to confirm or vacate an appraisal award. *See, e.g.*, *Amerex Grp., Inc.* 2010 WL 3790637, at *3; *Questrom*, 41 F. Supp. 2d at 302 n.55; *Johnson v. Chem. Bank*, 555 N.Y.S.2d 538, 541 (J. Ct. 1990).

Petitioners move to vacate Judge Beeler's appraisal award arguing that he acted outside the scope of his authority because he did not value the photographs according to the net consignment value plus ten percent as required by the Gallery policy. Pet'rs' Mem. Law 2. Petitioners argue that Judge Beeler "rewrote" the insurance policies by valuing the photos as if they were being appraised for a future sale and by applying a blockage discount, which was not a valuation methodology included in the insurance policies. *Id.* Moreover, Petitioners argue that Judge Beeler failed to cite any evidence that Silverstein was engaged in self-dealing and that the

9

net assignment value was not a *bona fide* valuation, which was the basis for Judge Beeler's decision not to apply the net consignment value. *Id.* In opposition, Respondent argues that Judge Beeler's finding that there was no arm's length consignment is presumptively valid and supported by the evidence, Resp't's Opp'n 5, and that fair market value and blockage discount are appropriate valuation methods, especially because fair market value is the valuation method required by the personal policy, *id.* at 15, 20.

The Court agrees with Respondent. Judge Beeler did not act outside the scope of his authority—he neither decided questions regarding the scope of the insurance coverage nor rewrote the insurance policy. Judge Beeler was expressly appointed as umpire under both insurance policies, Wade Aff. Ex. F, and the personal policy listed fair market value as a valuation method for appraisal, Mallin Decl. Ex. B ¶ 6. Thus, although not stating so explicitly, Judge Beeler's adoption of the fair market value approach was consistent with the terms of the personal policy, which was one of the sources of his authority as umpire.[10] The adoption of the blockage discount also fell squarely within Judge Beeler's role as an appraiser because it was part of the valuation analysis. The decisions to apply a blockage discount and to select the appropriate discount amount are judgment calls within the purview of the appraiser, just like the decisions whether to include, and how to account for, auction data and purchase price.

Furthermore, Judge Beeler's determination that the Paulin photographs were not legitimately consigned from Silverstein to the Gallery because there was no arm's length transaction resolved a factual question and not a question regarding the scope of the insurance coverage, which is "a purely legal issue," *Duane Reade, Inc.*, 411 F.3d at 389. Whether the

---

[10]     Petitioners cite New York Insurance Law § 3408(c) and related cases in support of their argument that an umpire must abide by the terms of the appraisal provision of the insurance policy. Pet'rs' Mem. Law 14-15. That statute, however, specifically regulates "standard fire insurance polic[ies] of the state of New York," N.Y. Ins. Law § 3408(c) (McKinney 2016), which is not the type of insurance policy at issue in this case.

10

Paulin photos were legitimately consigned to the Gallery is not a dispute that "goes to coverage under the policy" that "can only be resolved by analysis and application of the policy." *Indian Chef, Inc.,* 2003 WL 329054, at *3 (quoting *Kawa v. Nationwide Mut. Fire Ins. Co.*, 664 N.Y.S.2d 430, 431 (Sup. Ct. 1997)) (internal quotation marks omitted). Judge Beeler's finding that there was no arm's length consignment from Silverstein to the Gallery did not affect the determination that the photographs were insured, and his finding was based exclusively on facts presented in the record. Mallin Decl. Ex. X, at 2-3.

Petitioners have not shown that Judge Beeler decided in bad faith that the photographs were not consigned at arm's length or that Weiner's fair market valuation, including the blockage discount, more accurately reflected the value of the loss. Judge Beeler adequately explained the rationale for his decisions; he discussed the arguments presented by both parties and explained the facts and arguments he found most persuasive in determining the more accurate loss valuation. Mallin Decl. Ex. X, at 2, 5. Petitioners have also not presented any evidence that Judge Beeler was biased or rendered a fraudulent appraisal. Given the deferential standard for the review of appraisal awards, there is simply no basis to vacate the appraisal award, and Petitioners' motion must be denied.

## CONCLUSION

For the foregoing reasons, Petitioners' petition and motion to vacate the appraisal award are DENIED, and the case is DISMISSED. The Clerk of Court is respectfully requested to terminate docket entry 10 and to close the case.

**SO ORDERED.**

Date:  July 26, 2016                   VALERIE CAPRONI
        New York, New York          **United States District Judge**